# AFFIDAVIT OF DEA SPECIAL AGENT ANDREW SNOW

I, Andrew Snow, Special Agent with the United States Drug Enforcement Administration ("DEA"), being duly sworn, depose and state:

**Introduction and Agent Background**

1. I make this affidavit in support of an application for search warrants to search and to seize relevant evidence found at the following locations:

    a) [Redacted] Drive in Leicester, Massachusetts, as further described in Attachment A.

    b) The person of Ryan FLYNN, as depicted in Attachment C.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2016. I am currently assigned to the DEA High Intensity Drug Trafficking Area (HIDTA) Task Force in Worcester, Massachusetts. Prior to my assignment to the Worcester HIDTA Task Force, I completed the twenty week DEA Basic Agent training academy in Quantico, Virginia, during which I successfully completed the requirements for graduation and was extensively trained in the investigation and enforcement of narcotics violations. Prior to my employment with the DEA, I was a police officer in Glocester, Rhode Island and East Providence, Rhode Island for a total of eight years, where I made numerous narcotics related arrests. During the course of my employment in law enforcement, I have received specialized training regarding the activities of narcotics traffickers and various aspects of narcotics investigation, including the methods used to (a) package, transport, and store and distribute narcotics and (b) conceal and launder the proceeds of narcotics trafficking.

3. In addition to my law enforcement training, I have experience investigating narcotics traffickers. I have participated in numerous narcotics investigations both as a Special

1

Agent as well as a police officer, during which I have conducted physical surveillance, utilized confidential informants, executed arrest and search and seizure warrants, and conducted court-authorized electronic surveillance. I have testified at trials and hearings in federal, state, and municipal court.

4. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers often use their personal residences to distribute drugs, store drugs, collect drug debts, and store drug proceeds.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that Vito NUZZOLILO[1] and others have violated 21 USC § 846 by conspiring to distribute controlled substances and have violated 21 USC § 841(a)(1) by distributing controlled substances (collectively, the "TARGET OFFENSES") There is also probable cause to believe that evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES will be found in the locations specified *supra* in Paragraph 1.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and other sources. This affidavit is intended to show that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.[2]

---

[1] Unless otherwise specified, all references in this affidavit to phone communications are to communications to or from 508-579-6081 (hereinafter "the NUZZOLILO phone"). I know – based on my analysis of the content of hundreds of intercepted calls and text messages, and based on agent surveillance and cell phone location data – that NUZZOLILO is the user of this telephone.

[2] References to intercepted phone communications in this affidavit are to communications intercepted pursuant to a court order in Case No. 17-94009-TSH, and derive from line sheets

**Probable Cause**

7.      This affidavit hereby incorporates those facts set forth in an unsigned affidavit attached as **Exhibit A** regarding a search of NUZZOLILO's residence at 325 Grafton Street, NUZZOLILO's Band Room, NUZZOLILO's vehicle, and the person of NUZZOLILO (the "NUZZOLILO Affidavit"). In swearing to this affidavit, I also swear and attest that all of the facts reflected in Exhibit A are true and correct to the best of my knowledge and belief.

8.      I believe, based on intercepted communications and agent surveillance, that Ryan FLYNN (*a/k/a* "Big Boy") is the user of phone number 774-239-1397,[3] which is subscribed in the name Reid Marinelli.

9.      I believe, based on the following information, that FLYNN resides at Redacted Redacted Drive in Leicester, Massachusetts:[4]

   a)    FLYNN Redacted Redacted. According to Massachusetts Registry of Motor Vehicle ("RMV") records, Redacted resides at Redacted Drive in Leicester.

---

prepared by law enforcement officers monitoring communications intercepted pursuant to the aforementioned court order. I have not personally listened to or transcribed the actual recordings of all phone calls referenced in this affidavit. As such, summaries of and other references to these phone communications should not be interpreted to be exact or verbatim. In addition, this affidavit summarizes selected portions or excerpts of certain phone communications, and does not attempt to summarize the entire content of each referenced call or text message. References to the counterparties of NUZZOLILO's phone communications in this Affidavit reflect my belief, based on a review of these communications and other information, regarding the identities of these counterparties.

[3] References to calls or text messages involving FLYNN in this affidavit are to calls or text messages to or from phone number 774-239-1397.

[4] The RMV address for Ryan FLYNN is Redacted Dewey Street, #1, in Worcester, Massachusetts.

b) FLYNN is the known user of a black pick-up truck bearing Massachusetts license plates SR141S, which is registered to [Redacted] at [Redacted] Drive in Leicester, Massachusetts (the "FLYNN Vehicle").

c) Ryan FLYNN maintains certain account at Digital Federal Credit Union ("DCU") under a member number ending 0829. FLYNN's [Redacted] [Redacted], is listed as a joint owner of this account. While other addresses are associated with FLYNN's DCU account (including [Redacted] Dewey Street, #1, in Worcester, Massachusetts), DCU has provided a Transaction History Summary for an account associated with member number ending 0829, current through April 26, 2017, that lists the following information in the upper-left corner: "Ryan Flynn / [Redacted] Dr / Leicester, MA 01524." In addition, cleared checks that were written in April 2017 and numerous prior months on a DCU checking account associated with member number ending 0829 bear the following information in the upper-left corner: "Ryan Flynn / [Redacted] / [Redacted] Dr / Leicester, MA 01524."

d) [Redacted] Drive in Leicester, Massachusetts is owned by [Redacted] [Redacted] Drive LLC. Ryan FLYNN and [Redacted], via their DCU account, write regular checks to [Redacted] Drive LLC, which are often described in the note section as "rent."

e) Information provided by the credit reporting agency Experian indicates that FLYNN's address is [Redacted] Drive in Leicester, Massachusetts. Experian also lists "[Redacted]" in Leicester and a Worcester address as previous addresses for FLYNN.

4

f) Agent surveillance has determined that, on May 9, 2017, the Flynn Vehicle was present on the premises of [Redacted] Drive in Leicester, Massachusetts.

10. On April 13, 2017, NUZZOLILO called FLYNN. FLYNN stated "I need some money from you," and NUZZOLILO replied "Alright, I'll have to see you tonight." Later that day, FLYNN sent a text message to NUZZOLILO that read "I need to see you in the am."

11. On April 14, 2017, FLYNN called NUZZOLILO and asked "how much paper do they have." NUZZOLILO replied "tons of it" and indicated that he has to go count it. FLYNN stated that he needs to see it as soon as possible and indicated that "the guy" has been on his ass since yesterday morning. Based on my training and experience, I believe that NUZZOLILO owed money to FLYNN for a drug debt, and that FLYNN was attempting to collect because he in turn owed money to his source of supply.

12. On April 14, 2017, NUZZOLILO called FLYNN and indicated that he (NUZZOLILO) had "11 on me now." Based on my training and experience, I believe that NUZZOLILO was telling FLYNN that he (NUZZOLILO) had $11,000 for FLYNN.

13. On April 14, 2017, FLYNN called NUZZOLILO. During the call, FLYNN indicated that he had checked a "book" and had NUZZOLILO at 5, not 450. NUZZOLILO asked "what is the number," and FLYNN replied that it is 85 even, with the 1,000. Based on my training and experience, I believe that FLYNN and NUZZOLILO were discussing the amount of a drug debt that NUZZOLILO owed to FLYNN (presumably $8,500).

14. Also on April 14, 2017, at approximately 3:59pm, an agent conducting surveillance observed the Flynn Vehicle enter the alleyway leading to the rear entrance of 325

Grafton Street in Worcester, Massachusetts.[5] A few minutes later, an agent observed NUZZOLILO exit 325 Grafton Street and enter the passenger side of the Flynn Vehicle. Approximately three minutes later, NUZZOLILO exited the truck and returned to 325 Grafton Street, and the Flynn Vehicle departed. The agent recognized FLYNN as the driver of the Flynn Vehicle.

15. On April 22, 2017, NUZZOLILO sent text messages to FLYNN that stated "I didnt forget you" and "im in the middle of my book…im just now gettn to ur side of my flip… no worries… ill be seeing u soon enough" and "ill have everything when im done." Based on my training and experience, I believe that NUZZOLILO was advising FLYNN that he (NUZZOLILO) was in the process of collecting outstanding drug debts ("my book") and would soon have collected money to pay to FLYNN.

16. On April 24, 2017, NUZZOLILO sent a text message to FLYNN that stated "I need this week to put together." Based on my training and experience, I believe that NUZZOLILO was advising FLYNN that he (NUZZOLILO) needed more time to collect the money that he (NUZZOLILO) owed to FLYNN.

17. On April 27, 2017, NUZZOLILO called FLYNN and said "I got a shit load of paperwork but I can't get it until like Friday and Saturday. And I got a shit load of stuff that I'm sitting on as well. I'm just trying to like... take it out and spit it out and just whip up the paperwork. That's all. But we're good. You'll have everything." Based on my training and experience, I believe that NUZZOLILO was indicating that he has a lot of cash ("paperwork") and drugs ("stuff"), and that he was trying to sell the drugs in order to generate more cash to pay

---

[5] A few minutes earlier, at approximately 3:55pm, the FLYNN called NUZZOLILO and indicated that he was there (presumably indicating that he was almost at 325 Grafton Street, where NUZZOLILO and Kristin LITTLE keep an apartment).

to FLYNN.  FLYNN replied "I just got people breathing down my neck buddy."  NUZZOLILO then agreed to meet FLYNN as soon as he had dropped off another person.

18.  Later on April 27, 2017, NUZZOLILO sent text messages to FLYNN that stated, in part, "Didnt forget you… you will be all set this week for sure."

19.  On April 30, 2017, NUZZOLILO sent text messages to FLYNN that stated "Almost finished…. Im def gonna need to see you like tommarro…. Jus a heads up… if you can be ready for me it will help" FLYNN replied "Ready when you are."   Based on my training and experience, I believe that NUZZOLILO was indicating that he would have money for FLYNN the following day (May 1) and that he wanted to obtain narcotics from FLYNN ("if you can be ready for me") as well, and that FLYNN agreed.

20.  On May 1, 2017, at approximately 2:41pm, NUZZOLILO called FLYNN and discussed an "issue" regarding "Tommy Walker," a "kid that works with me… up in Maine." NUZZOLILO stated that he (NUZZOLILO) had given him (Tommy) "2 onions for the fucken beef stew" and that he (NUZZOLILO) was supposed to see Tommy for 4 out of the 8 racks "I gotta give."  Based on my training and experience, I believe that NUZZOLILO was indicating that he had given two ounces of cocaine ("onions") to WALKER and was supposed to receive $4,000 (4 racks) back from WALKER, which represented half of the $8,000 (8 racks) that NUZZOLILO owed to FLYNN.  NUZZOLILO also stated that Tommy was in Billerica on a 25,000 bail because "he got fucken nailed on the highway", which I believe to be a reference to the fact that Thomas WALKER was arrested on drug charges after leaving NUZZOLILO's residence on April 27, 2017.  FLYNN stated "I need some paperwork from you so what are we gonna do," and NUZZOLILO replied that he had $4,000 ("4 racks") but that Tommy being in Billerica was "Fucking up my timetable."  NUZZOLILO stated "I got plenty: I got 50 racks I

7

been sitting on, I just gotta go burn them off.  Fire.  I'm all out of the whi—I got plenty of one but nothing of the other.  That's my issue."  Based on my training and experience, I believe that NUZZOLILO was indicating that he has $50,000 worth of heroin ("50 racks" of "fire") that he can sell to generate cash for FLYNN, but that he was seeking to acquire additional cocaine ("the whi-" "the other").  FLYNN stated "it's been so long that my people been up my ass. I'm actually even giving them some of my own paperwork and you know I got bills due today."  Based on my training and experience, I believe that FLYNN was indicating that his suppliers had been applying pressure, and that he (FLYNN) had even had to pay his own cash ("paperwork") to cover debt associated with narcotics fronted to NUZZOLILO.  FLYNN also stated "just... give me what you can for today and then we'll see what we can do. I'll see if I can make something happen for you but at this point, it may or may not happen."  Based on my training and experience, I believe that FLYNN was indicating that he wanted NUZZOLILO to pay him (FLYNN) today and that FLYNN would try to arrange for additional cocaine for NUZZOLILO, but was not sure if he could.

21.    Later on May 1, 2017, NUZZOLILO sent text messages to FLYNN that read, in part, "you will have everything...i have half on me now" and "let me figure it out … i have way plenty to cover it."  I believe, based on my training and experience, that NUZZOLILO was indicating that he would pay half of his debt in cash to FLYNN and could figure out how to pay the remainder because he had "plenty" (either plenty of drug debts to collect or plenty of narcotics to sell).

22.    On May 1, 2017, at approximately 4:20pm, NUZZOLILO called FLYNN.  NUZZOLILO stated "I got 6 at the moment," that he was "right around… 6 racks," and that he

8

"should probably have everything by tonight." NUZZOLILO also referenced obtaining additional cash ("paperwork") from [Redacted]."[6]

23. Data produced by Sprint show that, at approximately 8:39pm on May 1, 2017, the NUZZOLILO phone was on [Redacted] Drive in Leicester, Massachusetts, within a margin of approximately 2561 meters of [Redacted] Drive. The data further show that, at approximately 8:56pm, the NUZZOLILO phone was almost in the precise location of [Redacted] [Redacted] Drive within a margin of approximately 14 meters.[7]

24. Information provided by Verizon shows that the Successor Phone made calls or sent text messages to FLYNN at 5:48pm, 7:34pm, 7:53pm, 8:14pm, and 8:28pm on May 1, 2017.

25. Based on the foregoing, I believe that NUZZOLILO traveled to FLYNN's residence at [Redacted] Drive in Leicester, Massachusetts on the evening of May 1, 2017.

26. I further believe that NUZZOLILO acquired cocaine from FLYNN at FLYNN's residence on May 1, 2017. This belief is based on the foregoing, on my training and experience,

---

[6] This appears to be a reference to [Redacted] On April 24, 2017, NUZZOLILO sent a text message to [Redacted] that read "Im not with the bitch yet....if u got paperwork drop it off." Based on my training and experience, I believe that NUZZOLILO was indicating that he did not have any cocaine ("bitch") and was asking [Redacted] to drop off cash ("paperwork"). Subsequently, [Redacted] replied that he would "have paper for you tomorrow."

[7] Sprint has provided location information in response to search warrants in Case 17-mj-4107-DHH. Data produced by wireless providers such as Sprint are not exact, and the accuracy of such data can vary up to 1,500 meters in some instances. Based on my training and experience, such data cannot conclusively establish that a given phone is a particular apartment in an urban area, but can establish that such a phone is in the general vicinity. Sprint provided times in Central Daylight Time; those times have been converted to Eastern Daylight Time in this affidavit.

9

and on NUZZOLILO's statements showing that he lacked supply of cocaine earlier on May 1, 2017 but had a supply of cocaine after traveling to FLYNN's residence. Specifically:

    a) At approximately 7:14pm on May 1, 2017, NUZZOLILO received a call from someone asking "are you around." NUZZOLILO replied "I'm only with Carlos at the moment. I will not see the lady until later." Based on my training and experience, and information developed during this investigation, I believe that NUZZOLILO was indicating that he only had heroin and would not have cocaine ("will not see the lady") until later that day.[8]

    b) On approximately 10:13pm on May 1, 2017, NUZZOLILO told another caller "I'm in the studio with the bitch." Based on my training and experience, and information developed during this investigation, I believe that NUZZOLILO was indicating that he had cocaine in his studio, *a/k/a* the "Band Room," at 75 Webster St. in Worcester, Massachusetts. Data produced by Sprint suggests that NUZZOLILO travelled from Leicester, Massachusetts back to the Band Room.[9]

27. Also on May 1, 2017, at approximately 9:40pm, NUZZOLILO sent a text message to FLYNN that read "Not even close… ugly." Based on my training and experience,

---

[8] NUZZOLILO also exchanged text messages around this same time with this same caller. The caller sent a text message that read "Deb?" NUZZOLILO replied "No....i need ur biil ...im a lil short to get her." Based on my training and experience, I believe that this customer was seeking cocaine ("Deb") and that NUZZOLILO replied that he needed money from this customer and that he did not yet have enough to obtain more cocaine ("lil short to get her"). Note that I believe, based on my training and experience, and knowledge developed during this investigation, that NUZZOLILO and his customers and co-conspirators use the terms "Deb," "Debbie," "girl," "lady" "white girl," "white" and "bitch") as coded references to cocaine, and use the term "Carlos" as a coded reference to heroin.

[9] At approximately 8:56pm, the NUZZOLILO phone was almost in the precise location of [Redacted] [Redacted] Drive, and at 9:13pm, the NUZZOLILO phone was almost in the precise location of the Band Room.

10

and the ensuing communications between FLYNN and NUZZOLILO, I believe that NUZZOLILO was criticizing the quality of the cocaine that he had just obtained from FLYNN.

28. On May 2, 2017, at approximately 3:57pm, FLYNN called NUZZOLILO and discussed the return of the cocaine that FLYNN had provided to NUZZOLILO. During the call, FLYNN asked "So we sending that back? What are we doing?" NUZZOLILO replied "how soon can I see you after I send it back?" FLYNN stated "hopefully soon" but that he didn't have an exact time, and that "he'll, uh, prepare right in front of me and show me there's nothing wrong with it." Based on my training and experience, I believe that NUZZOLILO was asking when he (NUZZOLILO) could obtain additional cocaine after returning the sub-par cocaine and that FLYNN was hopeful that it would be soon and that his (FLYNN's) unidentified source of supply would prepare and package under his (FLYNN's) observation to demonstrate that it had not been overly cut, diluted, or modified. Also during this call, FLYNN stated that he (presumably, FLYNN's source of supply) "had no problem taking it back as long as… nothing happened to it." NUZZOLILO then stated "That's like the worst… work ever" and that there was "nothing I can do worse than that fucking shit than it already is." Based on my training and experience, I believe that FLYNN was indicating that his source of supply would accept a return of the cocaine as long as no one had diluted or cut it, and NUZZOLILO indicated that the cocaine was of such bad quality ("the worst") that it could not be diluted further.[10]

29. Data produced by Sprint show that, at various times on May 4, 2017, the NUZZOLILO phone was in Leicester, Massachusetts. The data further show that, at

---

[10] I know from my analysis of intercepted communications in this case that NUZZOLILO and his customers and co-conspirators use the term "work" as a coded reference to illegal narcotics.

approximately 10:18pm, the NUZZOLILO phone was within approximately 1,000 feet of [Redacted] [Redacted] Drive.

30. At approximately 2:47am on May 5, 2017, NUZZOLILO sent a text message to Kristin LITTLE that read, in part, "bigboy all set nice." Based on my training and experience, I believe that NUZZOLILO was indicating that he was "all set" after meeting with FLYNN ("bigboy").

31. Based on the foregoing, I believe that NUZZOLILO traveled to FLYNN's residence at [Redacted] Drive in Leicester, Massachusetts on May 4, 2017 to return cocaine that he had previously obtained from FLYNN but that he deemed to be of poor quality and/or to obtain additional cocaine.

32. According to DCU records, many thousands of dollars in cash have been deposited into FLYNN's account (an account associated with member number ending 0829) on frequent occasions dating back to at least 2014. Based on my training and experience, this high level of cash activity is consistent with the type of bank activity often conducted by drug traffickers.[11] Among the many cash deposits into this account were the following:

a) 4/21/17: $1,450 cash
b) 4/12/17: $2,760 cash
c) 4/6/17: $2,900 cash
d) 4/4/17: $1,000 cash
e) 3/27/17: $990 cash
f) 3/23/17: $2,500 cash
g) 3/15/17: $1,250 cash
h) 3/7/17: $1,660 cash

---

[11] Based on my training and experience, when individuals involved in the distribution of narcotics usually seek to use the cash proceeds of their narcotics sales in ways that are not conducive to cash transactions (*e.g.*, to make electronic purchases or to pay bills), they will often do so by depositing large amounts of cash into their bank accounts. Put another way, large cash deposits into a bank account often signify that the account is used to deposit proceeds from drug sales or other illegal activity.

i) 2/28/17: $3,000 cash

j) 2/24/17: $1,360 cash

k) 2/16/17: $1,900 cash

l) 2/6/17: :$5,998 cash

m) 1/31/17: $900 cash

n) 1/26/17: $1,000 cash

o) 1/12/17: $1,310 cash

p) 1/9/17: $780 cash

q) 1/4/17: $1,000 cash

r) 8/26/16: $4,000 cash

s) 8/3/16: $3,650 cash

t) 4/8/16: $2,700 cash

u) 3/12/16: $6,000 cash

v) 3/4/16: $2,560 cash

w) 2/26/16: $2,200 cash

x) 2/1/16: $3,450 cash

y) 1/9/16: $2,000 cash

z) 1/4/16: $2,500 cash

## SEARCH AND SEIZURE OF DEVICES AND DATA

33. Intercepted communications have established that FLYNN utilizes a mobile device to send and/or receive text messages pertinent to his illegal drug activities. Devices used to send and receive text messages commonly include computers, telephones, tablets, and – most commonly – smartphones.[12]

34. Based on my training and experience, and common sense, I know that individuals often keep their smartphones or other mobile devices in their residences when they are home, and on their person or in their vehicle when they are outside the home.

35. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software, or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or

---

[12] Smartphones, tablets, and similar devices can function essentially as small computers.

programmed destruction, it is often necessary that computer hardware, computer software, electronic devices, and electronic storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

36. The premises to be searched may contain computer equipment whose use in the crimes or storage of the things described in these warrants is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of these warrants. If the items that are authorized to be seized in connection with these search warrants are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

**CONCLUSION**

37.     Based on the facts as set forth in this affidavit, I believe probable cause exists to search the following locations for evidence, fruits, and instrumentalities of the TARGET OFFENSES, as described in Attachment B:

    a)   [Redacted] Drive in Leicester, Massachusetts, as further described in Attachment A.

    b)   The person of Ryan FLYNN, as depicted in Attachment C.

                          Andrew Snow
                            Special Agent, DEA

Sworn to before me on May __23__, 2017

Honorable David H. Hennessy
U.S. Magistrate Judge

15